Filed 11/22/22 P. v. Calvert CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H047146 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1893273) |
| v. | |
| ADRIAN RODRIGUEZ CALVERT, | |
| Defendant and Appellant. | |

A jury convicted defendant Adrian Rodriguez Calvert of second degree murder and three counts of attempted murder for stabbing four men during a confrontation on a street in San Jose. The jury also found true various sentence enhancement allegations, including gang enhancements. The trial court sentenced Calvert to 15 years to life for the murder consecutive to a term of 14 years and four months.

On appeal, Calvert raises eight claims of error. Stated broadly, he contests two jury instructions on self-defense (CALCRIM Nos. 3471 & 3472), the admission of evidence about his gang affiliation, the cumulative prejudice of the alleged errors, the jury's findings on the gang enhancement allegations, and various aspects of his sentence.

For the reasons explained below, we reject Calvert's claims challenging his convictions but reverse the true findings on the gang enhancement allegations, vacate his

sentence entirely, and remand with directions for retrial on the gang enhancement allegations and resentencing.

## I. FACTS AND PROCEDURAL BACKGROUND

A. *Procedural History*

In November 2018, the Santa Clara County District Attorney filed an information charging Calvert and his codefendant, Gener Rabino, with the murder of Valentin B. (Pen. Code, § 187, subd. (a);[1] count 1), and the attempted murder of Aaron P., Eric C., and Otoniel C. (§§ 187, subd. (a), 664; counts 2–4).[2] For all counts, the information alleged that Calvert personally used a deadly and dangerous weapon (a knife) (§ 12022, subd. (b)(1)) and that Calvert and Rabino committed the charged crimes for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(5)) (gang enhancement). For counts 2, 3, and 4, the information further alleged that Calvert and Rabino committed the attempted murders willfully, deliberately, and with premeditation (§§ 187, 189, 664) and that Calvert personally inflicted great bodily injury on the victim (§§ 12022.7, subd. (a), 1203, subd. (e)(3)).[3]

In February 2019, the jury found Calvert guilty of murder as charged in count 1 but found not true an allegation that the crime was in the first degree. The jury also found Calvert guilty of all three counts of attempted murder (counts 2–4) but found not true the attendant allegations that the attempted murders were willful, premeditated, and

---

[1] Unspecified statutory references are to the Penal Code.

[2] The information identifies the victims by their first names and the first letter of their last names. We refer to the victims and certain witnesses in similar fashion to protect their privacy interests. (See Cal. Rules of Court, rule 8.90(b)(4), (10).)

[3] Prior to Calvert's trial, the district attorney amended the information to add an assault charge against Rabino (§ 245, subd. (a)(4); count 5) with a gang enhancement (§ 186.22, subd. (b)(1)(A)). The district attorney and Rabino then resolved the case by a plea to count 5 and admission of the gang enhancement. The trial court sentenced Rabino to a three-year prison term.

deliberate. In addition, the jury found true all the weapon, gang, and great bodily injury allegations.

In May 2019, the trial court sentenced Calvert to 15 years to life, consecutive to a term of 14 years and four months. The sentence consisted of an indeterminate term of 15 years to life plus a one-year weapon use enhancement for the murder conviction (count 1) and a consecutive determinate term of seven years plus a one-year weapon use enhancement (count 2), and two consecutive terms of two years four months plus a four-month weapon use enhancement (counts 3 & 4). The court struck under section 1385 the punishments for the gang (former § 186.22, subd. (g)) and great bodily injury enhancements (§§ 12022.7, subd. (a), 1203, subd. (e)(3)).

The trial court ordered Calvert to pay victim restitution to three parties plus administrative fees (former § 1203.1, subd. (l)). The court also imposed a $300 restitution fine (§ 1202.4), a suspended $300 parole revocation restitution fine (§ 1202.45), a $160 court security fee (§ 1465.8), a $120 criminal conviction assessment (Gov. Code, § 70373), and a $129.75 criminal justice administration fee (CJAF) (Gov. Code, former §§ 29550, 29550.1, 29550.2).

Calvert timely appealed.

B. *Evidence Presented at Trial*

1. Prosecution Evidence

On April 22, 2018,[4] a San Jose Police Department officer saw Calvert with a couple of other people in the parking lot of Starbird Park in West San Jose. Members of the Sureño gang Varrio Sur Town (VST) commonly hung out at the park, which was within the gang's claimed territory. The officer spotted a large knife near the center console of Calvert's car. Calvert said the knife was his, and the officer confirmed that the knife was legal to possess if carried openly.

---

[4] Unless otherwise indicated, all dates were in 2018.

On June 8, about 11:00 p.m., Noe Santillano picked up Calvert's codefendant Rabino and Rabino's brother Mrk Romero. Santillano drove Rabino and Romero to their residence in Sunnyvale, where they all smoked marijuana.[5] Calvert called Rabino about having some drinks. Calvert was 21 years old, and Santillano had previously worked and socialized with him. Santillano testified that he did not know Calvert, Rabino, or Romero to be gang members.

Santillano, Rabino, and Romero picked up Calvert at his house. Calvert was wearing a black sweater and carried a checkered backpack and a knife that was attached to his belt by holster or sheath. Calvert showed his knife to the group. Santillano asked Calvert why he had the knife and said, " 'You know you shouldn't have that.' " Calvert responded, " 'It's all right' " or " 'Yeah, whatever. Don't trip.' "

The group returned to Rabino's and Romero's residence and drank alcohol for a couple of hours. Calvert suggested that they all go to his friend's home. While Santillano drove the group in his car, Calvert provided directions to his friend's apartment.

According to Santillano, along the way and as they approached their destination in San Jose, Calvert and Rabino whistled and repeatedly shouted out of the car's open windows " 'Fuck Sur Trece' " and " 'Norte.' " Santillano parked in a lot under the apartment complex, and Calvert and Rabino eventually entered the complex to find their friend Ivan. Later, Santillano and Romero also entered the complex. The complex was located in an area claimed by the VST Sureños gang, about a quarter mile from Starbird Park.

As Santillano and Romero looked for Calvert and Rabino in the complex, Romero heard Calvert shouting " 'Norte' " several times. Santillano and Romero eventually encountered Calvert and Rabino heading back downstairs toward the street level.

---

[5] Santillano and Romero testified at trial under a use-immunity agreement.

Santillano later heard a commotion from below that sounded like "people were going to fight." Santillano and Romero exited the complex.

According to Romero, Rabino and Calvert were on the street in front of the complex. Calvert yelled " 'Norte' " a couple of times as four men ran and then walked toward him and Rabino. The men asked them, " 'Do you bang?' " Calvert responded, " 'No,' " and the men kept walking toward him and Rabino. Romero testified that Rabino ran away before the men were close enough to punch him. However, Romero had previously testified at the preliminary hearing that he had originally told the police Rabino punched one of the men before fleeing and that he had given this incorrect information to the police because he was confused.[6]

According to Romero, Calvert approached the men, reached for his knife, and swung it. Calvert stabbed Valentin B., who fell to the ground. Calvert then charged at the three other men as they ran away to the south, but Romero did not see whether Calvert caught up with them. Aaron P., Otoniel C., and Eric C. were stabbed multiple times during the incident.[7]

Santillano testified that, when he reached the street, he saw the silhouettes of about 10 people running around a nearby street corner away from Valentin B., who was lying in the street bleeding. Romero told Santillano that he (Romero) was going to go look for his brother Rabino. Santillano then drove away from the scene. Romero testified that he

---

[6] While Rabino was in jail pending trial, Romero and Rabino spoke by telephone. Rabino asked Romero whether he had told the police that he (Rabino) punched one of the men. When Romero confirmed that he had told the police that information, Rabino denied punching anyone and accused Romero of snitching on him.

[7] San Jose Police Department Detective Richard Martinez testified as an expert on Sureño and Norteño gangs. Detective Martinez opined that Valentin B., Otoniel C., and Eric C. (who all had gang-associated tattoos) were members of the VST Sureños criminal street gang. Detective Martinez further opined that Aaron P. was an associate of the VST gang.

Only Aaron P. testified at trial, but excerpts of Aaron P.'s, Otoniel C.'s, and Eric C.'s medical records (which described their injuries) were admitted into evidence.

found Rabino, who called their mom. Romero and Rabino walked south past the scene to a nearby post office.

Manuel V., a resident of the apartment complex, testified that he was awoken in the early morning hours of June 9 by people shouting " 'Norte' " more than once, " 'Fuck,' " and " 'What's up, fool?' " Manuel V. heard fighting and people being hit. He looked out his window and saw a four-on-three fight in the street (San Tomas Aquino Road). Before the fight ended, a person wearing a blue backpack ran toward the south, screaming after having been punched that he did not " 'even bang.' "

When the fight broke up, four of the people involved moved quickly toward the apartment complex, while two others ran north. Manuel V. saw all of the men involved throwing punches, except the person who had run away screaming. One of the people who moved toward the apartment complex said he had been stabbed and asked that someone call 911. The fight lasted about 30 to 60 seconds. About five minutes later, two people walked by from north to south—they appeared to be looking for someone and were wearing clothing different than that worn by the two men who had previously run north. About 15 minutes after the fight broke up, Manuel V. saw the man with the backpack wave at the police, who then arrested him.

Laura A. lived across the street from the apartment complex. She awoke when she heard a noise about 4:00 a.m. She looked out her window. Although her view was partly obstructed by a tree, she saw around eight or 10 people in the street. Some of the men ran across the street to the apartment complex, and another man ran in a different direction. The man who eventually died in the street appeared to be fighting with another man. Laura A. also saw a man run south (toward Payne Avenue), away from two men who were throwing punches and trying to fight and beat him. That man "looked a little heavier," "had long hair" that was " 'puffy,' " was wearing a backpack, and had a long object in his hand that "looked like a loaf of bread." After the heavier man ran away, the two men who had pursued him went into the garage of the apartment complex. A few

6

minutes later, Laura A. saw two men walk past the scene heading south toward Payne Avenue.

Calvert called 911 after the incident, and the police took him into custody at the scene. Calvert did not appear to be especially intoxicated. He told the police where he had thrown his knife, and the police recovered it from a nearby backyard south of the scene. No other knife was recovered from the scene or the victims. After Valentin B. was transported to the hospital, police observed an approximately 64-foot long, north-to-south " 'drip trail' " the ended near a bloodied T-shirt and pool of blood. Forensic testing conducted on Calvert's knife revealed the presence of Otoniel C.'s DNA on the blade and that Calvert was possibly a major contributor to a DNA mixture found on the knife's handle.

San Jose Police Department Officer Todd Jennings testified (in rebuttal) that he and his partner Sergeant Jesus Mendoza interviewed Calvert for about three hours on the afternoon or early evening of June 9. Calvert reported that he had a bump on his head, but Officer Jennings did not see any redness or bruising and did not feel Calvert's head for a bump. Jennings only saw some injuries on Calvert's knuckles.[8] Calvert provided the name Ivan " 'Squeaky' " Saucedo and said he had stabbed two individuals, but he did not say other people were involved in the incident. After the interview, the police confirmed with Saucedo that Calvert and the others were trying to contact him early on June 9.

Santa Clara County Correctional Officer Charles Martin testified that, in the late evening of June 9, he interviewed Calvert for jail classification purposes. Martin explained that during the classification process, he routinely asked incoming inmates questions about their gang activity. At the Santa Clara County jail, the majority of gang-

---

[8] Calvert testified in the defense case that the injuries he had on his hand were caused by a game of "Bloody Knuckles" that he had played with Santillano earlier that night, before the incident outside the apartment complex.

7

affiliated inmates are Norteños. Norteños are primarily housed in the general population of the jail, and Sureños are segregated from their Norteño rivals. On cross-examination, Martin said that if a jail inmate falsely claimed to be a Norteño, he might be beaten by the true gang members in the jail.

During the classification interview, Calvert initially said he did not consider himself to be a gang member. When Martin asked Calvert whether that meant it would be okay to house him with Sureños, Calvert said, " 'No.' " Next, when asked if he considered himself to be a Norteño, Calvert replied, " 'Yes.' " Calvert also said that he was a member of "Via Sol" and had the moniker " 'Ace.' "[9]

An autopsy conducted on Valentin B.'s body revealed that he was approximately 5 feet 11 inches tall and weighed 280 pounds. He had a seven-inch deep stab wound on the left side of his upper chest which penetrated his heart. He also had a stab wound to his right lower back, some bruises on his upper left arm, an abrasion on his right forearm, and an abrasion on his forehead. Valentin B.'s chest wound was consistent with being stabbed with a knife (rather than being slashed). Blood tests revealed that Valentin B. was intoxicated at the time of his death (i.e., 0.159 percent blood-alcohol concentration) and had an amount of cocaine in his system "consistent with recreational use," which, in general, could increase a person's potential for engaging in violence.

---

[9] After Officer Martin testified, the trial court held an Evidence Code section 402 hearing (hereafter section 402 hearing) regarding Calvert's waiver of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*). Officer Jennings testified that Sergeant Mendoza had read his *Miranda* rights to Calvert on June 9 about 4:48 p.m. Calvert acknowledged his rights and talked to Jennings and Mendoza for a few hours. Immediately after the interview, Calvert was taken to the county jail for booking. Based on Jennings's section 402 hearing testimony, the trial court ruled that Calvert knowingly, voluntarily, and intelligently waived his *Miranda* rights as to both the police interview and the subsequent statements Calvert made to Officer Martin during the jail classification process.

During the police investigation, officers executed a search warrant on Calvert's home and confiscated numerous items of red clothing from his bedroom. The clothing's color and logos indicated a possible "Northerner" gang association.

Regarding Calvert's and Rabino's gang affiliation and gang conduct, Sunnyvale Police Department Detective Sean Mula testified as an expert in the Norteño gang and its subset Varrio Via Sol (VVS). Detective Mula described the organizational structure, signs, and symbols of the gang and the common activities and conduct of the gang's membership.

Detective Mula opined that Calvert was a member of the VVS gang. Mula based his opinion on Calvert's various statements, associations with Norteño gang members, social media content, tattoos, and apparel. Mula further opined that Rabino was a Norteño associate. Mula based that opinion mainly on Rabino's prior involvement in spraying gang-related graffiti and on the various items and indicia associated with the Norteños that were found in Rabino's home.

In addition, Detective Mula opined that in a hypothetical scenario where a man left Norteño territory and entered Sureño territory armed with a knife, shouted " 'Norte' " or " 'Fuck Sur Trece,' " and whistled until he was checked by a group of four Sureño-associated men whom he stabbed during a fight, that crime was committed for the benefit of a criminal street gang with the intent to assist, further, or promote criminal conduct by gang members. Mula explained how the crime enhanced the gang's reputation. Additionally, San Jose Police Department Detective Martinez provided similar opinions about the crime.

Detectives Mula and Martinez explained that a person who enters gang territory and shouts the name of a rival gang will provoke a "street check" and/or fight with the territory's gang members. According to Martinez, gang members frequently will enter rival gang territory to go " 'hunting' " or seek out rivals to instigate altercations in order to bolster their reputations and earn respect from their gang.

9

According to Detective Mula, the primary activities of VVS members involved assaults with a deadly weapon and VVS members commonly carried weapons such as knives or bats. Regarding predicate offenses committed by VVS gang members, the prosecution presented evidence about: (1) Paul Carmona's conviction of criminal threats (§ 422) for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(1)(A)), committed on April 22, 2012; (2) Frank Memolo's and Mauricio Murillo's convictions of assault with force likely to cause great bodily injury (§ 245, subd (a)(4)) for the benefit of, at the direction of, or in association with a criminal street gang, committed on November 30, 2013; (3) Anthony Hofland's conviction of assault (§ 245, subd (a)(4)) for the benefit of, at the direction of, or in association with a criminal street gang, committed on January 19, 2014; and (4) Jesus Ibarra's conviction of carrying a loaded firearm in a vehicle (§ 25850) for the benefit of, at the direction of, or in association with a criminal street gang, committed on March 22, 2015.

### 2. Defense Evidence

Calvert testified as the only defense witness. Calvert said he is 6 feet 2 inches tall and 270 pounds. He admitted stabbing "one or more men" in self-defense because they were attacking him, and he believes he "saw a knife." Calvert did not intend or want to kill anyone when he stabbed the men. He also said that he did not act at the direction of, in association with, or for the benefit of the VVS gang or any other Norteño gang. He denied being a gang member.

Calvert explained that he grew up in Sunnyvale around peers who identified themselves as either Sureños or Norteños, and he was identified by others at school as a "Norteño kid" because he "used to hang around them in school." Since then, some people had continued to recognize him as a Norteño gang member.

On April 22, Calvert was drinking and smoking marijuana at Starbird Park with his friend Ben (who lived across the street from the park) and some others. Calvert frequented the park "[e]very other day" around that time and knew it was in a Sureño

10

neighborhood. At the park, a police officer advised Calvert not to carry his knife because the "cops will harass you for it." The officer also confirmed that it was legal to carry the knife visibly.

Calvert testified that he "always had knives" and purchased his large knife because he "just wanted a bigger one." Calvert carried his knife "[e]very day." He explained why: "A lot of people don't like me" "[b]ecause my past, how I was just -- in my -- hung around Northerners in school [*sic*]." He said further (on cross-examination) that he carried the knife for "[s]afety" to defend himself "in case someone attacks [him]."

On the night of June 8, Calvert was home, drinking whiskey and watching TV alone. He posted what he was doing on his social media, and Rabino responded by saying, " 'Drink up.' " Calvert had met Rabino about a year earlier through Santillano and had drunk alcohol with them once before. Calvert had never met Romero and did not know Santillano or Rabino to be associated with the Norteños.

Calvert arranged with Santillano to be picked up. After the group picked up Calvert, they drove to Rabino's house and drank alcohol "for a while." Rabino suggested that the group meet up with Ivan Saucedo (whom Calvert knew from high school) to obtain some marijuana. Saucedo gave Rabino an address, and the group drove there, stopping at two stores along the way to obtain more alcohol. By the time they reached their destination in San Jose, Calvert had drunk a "half a bottle" of whiskey, some more alcohol from two other bottles, and two tall cans of beer. Calvert "definitely" was drunk and acknowledged that, as a result, "[he] d[id]n't remember a whole lot."

Calvert denied that he or anyone else had yelled " 'Norte' " out of Santillano's car during the drive to San Jose. He had not previously been to the location where the incident occurred and had no idea whether that area was gang territory. When the group arrived at the apartment complex, they drank for 10 minutes, and then Calvert and Rabino went to look for Saucedo using an application on Rabino's cellphone that displayed Saucedo's location. Calvert whistled in order to find Saucedo, but Saucedo messaged

11

Rabino saying he could not hear any whistling. Calvert denied that he or Rabino ever yelled " 'Norte' " or " 'Fuck Sur Trece' " at the apartment complex.

Unable to locate Saucedo, Calvert and Rabino exited the apartment complex and looked for but could not find Santillano's car. Calvert and Rabino then "ran out to the street," still looking for Santillano's car. There, "[l]ike, six" men ran at them from "in the building," yelling " 'Hey, where you going? It's VST right here.' " Based on Calvert's past experiences at school, he knew the men were Sureños and thought they were going to "beat [him] up."

Rabino fled without throwing a punch or doing anything else. Calvert "stopped" and "turned around," worried about being beaten up if he were to turn his back to the men and try to run away Calvert testified, "They were really close to [him]. [He] . . . was afraid they . . . were just going to whack [him] in the back of the head." He also said that he did not attempt to run away because he is "heavy," "can't run that fast," and did not know the area or "where we were running to."

The men asked Calvert " 'do you bang?' " Calvert replied, " 'No, I don't bang. I think you got the wrong person.' " The men "were all circled around [him]," about five feet away. He was worried the men on his side were "[were] going to jump" him. He saw a small man in front of him "reach for his pocket." Calvert thought the man had a knife and was going to use it. Calvert pulled out his knife. Next, the men "started attacking" Calvert. Calvert explained, "One of the guys in front of [him] struck [him], [his] left side. That other guy -- he started hitting [Calvert]. All of them started hitting [him]."

After being struck by a fist in the left temple, Calvert "started, like, slicing [his knife] towards them, trying to get them away from [him], but that didn't stop them." He did not target particular people with his knife, rather he "was trying . . . to get all of them at once." He said that he did not "thrust[] [his] knife out" toward the men. He also testified that he had deliberately tried to stab someone during the incident, explaining, "I,

12

like, stabbed one of them in the stomach, and then I pulled it out, and the ribs too. Then the other guy . . . kept on hitting me, and so I did it to them [*sic*] too."

Calvert was scared, and "[i]t happened fast." Although he was concerned that he might hurt someone by thrusting and slashing with his knife, he "didn't think [he] was going to kill anyone." He testified that he recalled "stabbing two of them," and said that he did not stab anyone who was not attacking him.

After Calvert stabbed the men, "They stopped. [He] started running. They started running, but they ran a different direction than [he] did." He felt safe running away at this point because the men "were trying to help the guy on the floor." Calvert ran toward Payne Avenue to get away from the men. He hid behind a van and threw his knife over a fence. He called 911, reporting what had happened and asking for help. When the police arrived, he told them where he had thrown the knife.

The police arrested Calvert, and detectives interviewed him for five or six hours, during which time he identified Rabino, Romero, Santillano, and Saucedo. Calvert acknowledged that he had not been completely truthful with the detectives, explaining that he was "scared."

Regarding his booking into the county jail, Calvert testified to the jury that Correctional Officer Martin told him that gang affiliation "wasn't even going to be brought up in court. He told [Calvert] it had nothing to do with court. 'You just tell me whatever you want to tell me. It's fine. They're not going to use it against you in court.' " When Martin asked Calvert if he was a "Northerner," Calvert said " 'No.' " Martin then asked if Calvert knew of the Sunnyvale gang " 'Via Sol.' " Calvert said he was familiar with it. The conversation continued: "Then he's, like, 'So you're part of them? [¶] I was, like, 'I'm . . . not part of it.' [¶] He's, like, 'But you know people from there. So you'd say you would associate with them?' [¶] I said, 'I guess, yeah. I didn't know what 'associate' meant at the time. [¶] . . . [¶] So I said, 'Yeah.' [¶] And then

13

he's, like. 'So you wouldn't care if we house you with Sureños? [¶] I was, like, 'Yeah, I would care, because my case involves Sureños.' " (Italics omitted.)

Calvert testified further that Officer Martin told him, " 'Well, when I house you, you're going to have to say you're a Northerner because of your paperwork. And if they find out you're lying, . . . they'll hurt you.' [¶] And then he said . . . [¶] . . . [¶] . . . they were most likely going to house me with an active gang member. And I [¶] . . . [¶] [] pretty much had no choice, because 95 percent of the jails are Northerners." Calvert testified that he "just told" Martin he "was a Northerner" but did not say he was member of or associated with the VVS gang. Calvert also explained that he told Martin that his family calls him " 'Ace.' "

In his testimony, Calvert provided explanations for his social media name (" 'Ace SV' "), the various items that were posted on his social media accounts, and why he had a red comforter and red bedroom curtains. He also said that Sureños (whom he called "scraps" on his social media) once slashed his tires and keyed his truck. He reported this incident to the Sunnyvale police, but "[t]hey said they couldn't do anything about it because it was just keyed. It has no fingerprints."

On cross-examination, Calvert acknowledged that he had told Detective Jennings and Sergeant Mendoza that only two people approached him during the incident on June 9. Calvert explained that he had "told [Jennings] two because all [he] remember[ed] was two." Calvert further acknowledged that the events he described on direct examination were what he believed happened, not what he in fact recalled having happened. He ultimately testified that he could only remember two men having run at him and Rabino that night, not six. Calvert admitted that he had used cocaine and alcohol that night and acknowledged knowing that shouting " 'Norte' " in Sureño territory is a provocation to Sureño gang members and a challenge to fight.

Calvert decided to "turn and fight" the men who ran at him. He wanted to stand his ground and knew he could pull out his knife (which had an eight-inch blade) to

14

defend himself. Calvert tried to "back [the men] off" and he stabbed Valentin B. after he (Calvert) "thought [Valentin B.] grabbed his knife." But Calvert did not actually see any knife, and he admitted that he had lied to the police when he had told them he saw the other man with a knife before grabbing it. Calvert testified that he only intended to scare the men by pulling out his knife, but he knew he could kill by stabbing someone with his knife in the back, stomach, or chest.

Calvert admitted having lied during the police interview when he said that one of the two men had walked into his knife. Calvert also admitted having lied to police at the scene when he said that the men tried to stab him with a knife (which he stopped with his hand) and further said, initially, that the men had taken away his knife and thrown it over a fence.

## II. DISCUSSION

Calvert raises eight claims of error. In his opening brief, he contends: (1) the trial court erred by instructing the jury on self-defense with CALCRIM Nos. 3471 and 3472; (2) the evidence about his admission of gang affiliation during the jail classification process should have been excluded as involuntary and an alleged statement made during the police interview should have been excluded as inadmissible testimonial hearsay; (3) the alleged errors were cumulatively prejudicial; (4) the matter should be remanded for resentencing due to recent legislative changes made to section 1170; (5) the $129.75 CJAF should be vacated in light of Assembly Bill No. 1869 (2019-2020 Reg. Sess.) (Assembly Bill 1869); (6) the victim restitution orders should be modified to strike the attached administrative fees on multiple grounds, including recent changes made by Assembly Bill No. 177 (2021-2022 Reg. Sess.) (Assembly Bill 177); and (7) the restitution fines, fees, and assessments should be stricken because the trial court failed to find that Calvert had an ability to pay them.

In a supplemental opening brief, Calvert contends that the jury's findings on the gang enhancements should be vacated, and the matter should be remanded because the

jury was not instructed on all the requisite elements under current section 186.22, as amended by Assembly Bill No. 333 (2021-2022 Reg. Sess.) (Assembly Bill 333).

We first address Calvert's claims regarding the self-defense instructions, his statements about gang affiliation, and cumulative error. We next consider Calvert's challenge to the gang enhancements. Finally, we turn to Calvert's various sentencing claims.

A. *Self-Defense Instructions*

CALCRIM No. 3471 provides instruction on self-defense in a mutual combat or initial aggressor scenario. CALCRIM No. 3472 instructs that the right to self-defense may not be contrived.

Calvert contends that CALCRIM Nos. 3471 and 3472 "erroneously authorized the jury to conclude that Calvert had no right to defend himself if he provoked or started the fight or quarrel by yelling 'Norte' and whistling, regardless of whether the Sureños' attack was unlawful and whether Calvert truly feared he was about to be killed or badly injured." Calvert asserts that "the instructions either should not have been given or should have been modified to explain that the 'aggressor' and 'contrived' limitations on self-defense apply only when a defendant 'th[r]ough his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified.' " He claims that the error here eviscerated his defense and allowed the jury to convict him without determining beyond a reasonable doubt that he did not act in either perfect or imperfect self-defense.[10]

Calvert acknowledges his defense counsel's failure to object to either of the challenged CALCRIM instructions. Nevertheless, Calvert urges us to consider his claim

---

[10] We note that Calvert does not assert that no substantial evidence supported the challenged instructions or that the prosecutor committed any error in his closing arguments.

16

under section 1259—given that the allegedly erroneous instructions affected his substantial rights[11]—or because we generally have discretion to eschew forfeiture. Alternatively, Calvert contends that his defense counsel was constitutionally ineffective when he failed to object to these instructions. Finally, Calvert asserts that the error requires reversal of his convictions for murder and attempted murder because it amounts to structural error or was prejudicial under any standard of prejudice.

The Attorney General responds that Calvert forfeited his claim by failing to request any modification of the challenged instructions and has failed to show that the alleged instructional error affected his substantial rights. The Attorney General argues further that Calvert's alternative ineffective assistance of counsel (IAC) claim is meritless because Calvert fails to demonstrate that his counsel's performance was objectively unreasonable or prejudicial.

### 1. Background

After the presentation of evidence, the trial court and counsel for the parties discussed the jury instructions in chambers, off the record. Neither the court nor counsel subsequently said anything on the record about their discussion of the instructions.

The trial court instructed the jury on count 1 regarding murder with malice aforethought (i.e., express and implied malice) and willful, deliberate, and premeditated first degree murder, as well as the lesser offenses of voluntary manslaughter based on sudden quarrel/heat of passion and voluntary manslaughter based on imperfect self-defense. For counts 2 through 4, the court instructed on the elements of attempted murder and willful, deliberate, and premeditated attempted murder, as well as the lesser

---

[11] Section 1259 provides, in relevant part, that an appellate court "may [] review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby." (§ 1259.)

offenses of attempted voluntary manslaughter based on sudden quarrel/heat of passion and attempted voluntary manslaughter based on imperfect self-defense.

Regarding self-defense, the trial court provided the jury multiple instructions addressing perfect (or complete) and imperfect self-defense. The court instructed on the elements of perfect self-defense using the standard instruction for justifiable homicide, CALCRIM No. 505. The court told the jury that Calvert "is not guilty of murder or manslaughter, attempted murder or attempted voluntary manslaughter if he was justified in killing or attempting to kill someone in self-defense." The instruction also stated: "The People have the burden of proving beyond a reasonable doubt that the killing or attempted killing was not justified. If the People have not met this burden, you must find the defendant not guilty of murder or manslaughter/attempted murder/attempted voluntary manslaughter."

CALCRIM No. 505 also informed the jury that a defendant acts in lawful self-defense if he "reasonably believed that he was in imminent danger of being killed or suffering great bodily injury," "reasonably believed that the immediate use of deadly force was necessary to defend against that danger," and "used no more force than was reasonably necessary to defend against that danger."

Relatedly, the court instructed with CALCRIM No. 3474 as follows: "The right to use force in self-defense continues only as long as the danger exists or reasonably appears to exist. When the attacker withdraws or no longer appears capable of inflicting any injury, then the right to use force ends."

In addition, the trial court instructed the jury with CALCRIM No. 3471, the pattern instruction on the right to self-defense in a mutual combat or initial aggressor scenario. The instruction provided: "A person who engages in mutual combat or who starts a fight has a right to self-defense only if: [¶] 1. he actually and in good faith tried to stop fighting; [¶] and [¶] 2. he indicated, by word or by conduct, to his opponent, in a way that a reasonable person would understand, that he wanted to stop fighting and that

18

he had stopped fighting[;] [¶] and [¶] 3. he gave his opponent a chance to stop fighting. [¶] If the defendant meets these requirements, he then had a right to self-defense if the opponent continued to fight. [¶] However, if the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not required to try to stop fighting, communicate the desire to stop to the opponent, or give the opponent a chance to stop fighting. [¶] A fight is mutual combat when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self-defense arose." (Some capitalization omitted.)

The trial court also instructed the jury with CALCRIM No. 3472, the pattern instruction providing that the right to self-defense may not be contrived. The instruction stated: "A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force."

Regarding imperfect self-defense, the instructions on voluntary manslaughter (CALCRIM No. 571) and attempted voluntary manslaughter (CALCRIM No. 604) told the jury that a killing or attempted killing is reduced from murder to voluntary manslaughter and attempted murder to attempted voluntary manslaughter, respectively, if the defendant killed or attempted to kill "because he acted in imperfect self-defense." The instructions explained that "[t]he difference between complete self-defense and imperfect self-defense depends on whether the defendant's belief in the need to use deadly force was reasonable." The instructions stated that for imperfect self-defense to apply, the defendant must have actually believed that he was in imminent danger of being killed or suffering great bodily injury and that the immediate use of deadly force was necessary to defend against the danger, but "[a]t least one of those beliefs was unreasonable."

19

In addition, the instruction for voluntary manslaughter based on imperfect self-defense told the jurors that "[i]mperfect self-defense does not apply when the defendant, through his own wrongful conduct, has created circumstances that justify his adversary's use of force." However, the parallel instruction on attempted voluntary manslaughter did not include any such language regarding the effect of defendant's wrongful conduct on imperfect self-defense. Further, both of these parallel imperfect self-defense instructions stated that "The People have the burden of proving beyond a reasonable doubt that the defendant was not acting in imperfect self-defense" and "[i]f the People have not met this burden, [the jurors] must find the defendant not guilty of murder" or "attempted murder," respectively.

Regarding voluntary manslaughter based on sudden quarrel/heat of passion, the instruction informed the jury that this offense occurred if "1. The defendant was provoked; [¶] 2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured (his/her) reasoning or judgment; [¶] and [¶] 3. The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment." (Some capitalization omitted.) The instruction for attempted voluntary manslaughter based on sudden quarrel/heat of passion included the additional elements of "at least one direct but ineffectual step toward killing a person" and an intent to kill that person. Both instructions also stated that "The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as the result of a sudden quarrel or in the heat of passion" and "[i]f the People have not met this burden, [the jurors] must find the defendant not guilty of murder" or "attempted murder," respectively.

During his closing argument, the prosecutor addressed self-defense at length. The prosecutor acknowledged that "Calvert did not have an obligation to retreat" and that "a person can pursue an aggressor until the danger of death or great bodily injury has passed." Notwithstanding these concessions, the prosecutor asked the jurors to consider

the significance of Calvert's decision to not retreat with regard to his mental state and whether any danger had passed during the confrontation.[12] The prosecutor argued further that at "the very minimum, this was a case of mutual combat. . . . But in all likelihood and the facts prove that Adrian Calvert started that fight at every step of the way." The prosecutor asserted that "Calvert's claim of self-defense is completely contrived" because he knowingly "created this threat from the very moment he stepped out of his car" (if not earlier "while they were still driving into San Jose") by challenging the neighborhood's Sureños when "shouting, over and over again, 'Norte.' " The prosecutor noted that Rabino had thrown the first punch "that start[ed] the conflict" and Calvert pulled out his knife and stabbed the victims despite that "[n]o on else had a knife in this fight." The prosecutor also said, "Calvert escalate[d] this fight, pushe[d] it to the point that the victims in this case ha[d] absolutely no choice but to fight back" and "defend themselves." Regarding mutual combat specifically, the prosecutor argued that even if the four victims and Calvert were all intent on fighting, Calvert did not try to stop fighting or withdraw from the fight. Rather, he charged at and chased the victims and ultimately escaped the incident uninjured.

Additionally, the prosecutor argued that for self-defense to apply, Calvert must have used only reasonable force. The prosecutor asserted that given the proof substantiating that Calvert was the only person with a weapon and that three of the victims ran away when Calvert pulled out his knife, Calvert did not act in self-defense.

Regarding voluntary manslaughter based on imperfect self-defense, the prosecutor argued that Calvert did not actually believe he needed to defend himself against the four unarmed men.

---

[12] Earlier in his closing argument, the prosecutor asserted that Calvert had stabbed Valentin B. twice, and then "[a]t that second fight location, some 75 feet south of where it happened, Mr. Calvert engage[d] in another fight, with" Eric C., Aaron P., and Otoniel C., stabbing them repeatedly, i.e., three times, five times, and one time, respectively.

As for voluntary manslaughter based on sudden quarrel/heat of passion, the prosecutor argued that Calvert did not "fit[] the requirements" because "[t]his is a fight he was seeking out," the four men having run toward Calvert after he shouted " 'Norte' " did not amount to sufficient provocation, Calvert's "group" (i.e., Rabino) started the fight by throwing the first punch, and Calvert then escalated it by stabbing Valentin B.

Regarding the attempted murder charges, the prosecutor argued that self-defense was "not viable" because Calvert's claim was "based on the idea that maybe [Valentin B.] ha[d] a knife" and when Calvert chased and stabbed the three other victims, the threat posed by any knife was over.

In the defense closing argument, Calvert's defense counsel urged the jurors to find Calvert not guilty of murder, manslaughter, attempted murder, and attempted manslaughter based on self-defense because the prosecutor had failed to prove that Calvert did not act in perfect self-defense. Alternatively, counsel argued that "at most, what this is, is voluntary manslaughter under a theory of sudden quarrel, mutual combat, or a theory of . . . honest, but unreasonable self-defense." In addition, counsel asserted that the prosecutor had failed to prove Calvert intended to kill, as required for convictions on attempted murder and attempted voluntary manslaughter.

Counsel argued that "it was Calvert who ran away" from an attack perpetrated by several men, "crying, screaming in terror," and that Calvert did not chase down any of the victims. Counsel further asserted that the evidence failed to prove Rabino had thrown a punch (thereby starting a fight) and, in any event, throwing a punch when being rushed by four Sureños doing a " 'street check' " is legally justified. Regarding the reasonableness of Calvert's beliefs about an imminent danger and the need to use force, counsel argued that Calvert's use of a knife in response to an attack by four gang members (one of whom reached for his pocket) was reasonable, as was "stabbing until he could get away."

22

On their fourth day of deliberations, the jurors rejected the prosecution's contention that Calvert had committed first degree murder (i.e., that he acted willfully, deliberately, and with premeditation) and found Calvert guilty of second degree murder (count 1).[13] The jurors also found Calvert guilty of attempted murder (counts 2–4) but rejected the allegation that those offenses were willful, premeditated, and deliberate.

### 2. Legal Principles

" 'In criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case.' [Citation.] That duty extends to instructions on the defendant's theory of the case, 'including instructions "as to defenses ' "that the defendant is relying on . . ., or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case." ' " ' " (*People v. Townsel* (2016) 63 Cal.4th 25, 58 (*Townsel*).) Moreover, "[e]ven if the court has no sua sponte duty to instruct on a particular legal point, when it does choose to instruct, it must do so correctly." (*People v. Castillo* (1997) 16 Cal.4th 1009, 1015; see also *Townsel*, at p. 58.)

Nevertheless, "[a] trial court has no sua sponte duty to revise or improve upon an accurate statement of law without a request from counsel [citation], and failure to request clarification of an otherwise correct instruction forfeits the claim of error for purposes of appeal." (*People v. Lee* (2011) 51 Cal.4th 620, 638 (*Lee*); see also *People v. Covarrubias* (2016) 1 Cal.5th 838, 873–874, 901; *People v. Bolin* (1998) 18 Cal.4th 297, 326.)

"To make out a claim that counsel rendered constitutionally ineffective assistance, 'the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms. Second, the

---

[13] The prosecutor had argued both express and implied malice to the jury. The verdict form for count 1, however, did not ask the jury to specify a finding for either express malice or implied malice.

defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different.' " (*People v. Hoyt* (2020) 8 Cal.5th 892, 958 (*Hoyt*); see also *Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) We can reject an ineffective assistance of counsel claim if the defendant fails to establish either element of the *Strickland* standard. (See *Strickland*, at p. 687; *People v. Kirkpatrick* (1994) 7 Cal.4th 988, 1008, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

"On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*People v. Mai* (2013) 57 Cal.4th 986, 1009 (*Mai*).)

3. Analysis

We begin our analysis of Calvert's claim by addressing the issue of forfeiture. Calvert argues that "[a]lthough CALCRIM Nos. 3471 and 3742 may be correct statements of the law in some cases, in this case they failed to convey relevant and important principles established by decades of case law – a defendant forfeits the right to self-defense by starting or provoking a fight or quarrel only if he did so through wrongful conduct such as the initiation of a physical attack or the commission of a felony and the adversary was legally justified in using responsive force." In his reply brief, Calvert asserts further that the two challenged instructions amount to incorrect statements of the law to which forfeiture does not apply, because they "fail[] to convey that a term – like the words 'starts' and 'provokes' in the challenged instructions -- has a technical legal meaning peculiar to an area of law."

24

Calvert acknowledges that the jury instructions were, in the abstract, correct statements of the law of self-defense. We conclude that Calvert's claim is best viewed as a challenge to instructions that were responsive to the evidence but otherwise incomplete on the particular facts of the case and thus should have been modified. Accordingly, Calvert's failure to object to or request modification of otherwise supported and correct jury instructions forfeited his current claim of error. (See *Lee*, *supra*, 51 Cal.4th at p. 638.)

Nevertheless, "[w]e may review defendant's claim of instructional error, even absent objection, to the extent his substantial rights were affected." (*Townsel*, *supra*, 63 Cal.4th at pp. 59–60; § 1259.) "Ascertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim—at least to the extent of ascertaining whether the asserted error would result in prejudice if error it was." (*People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249.) In addition, " '[s]ubstantial rights' are equated with errors resulting in a miscarriage of justice under *People v. Watson* [(1956)] 46 Cal.2d 818." (*People v. Mitchell* (2008) 164 Cal.App.4th 442, 465.)

Based on our review of the evidence, arguments, and instructions, Calvert's substantial rights were not affected by the unmodified, challenged instructions. The jury received multiple proper instructions on perfect and imperfect self-defense. The two instructions Calvert challenges in this appeal have been accepted by courts as legally correct. CALCRIM No. 3471 (mutual combat or initial aggressor) is generally a correct statement of the law. (See *People v. Nguyen* (2015) 61 Cal.4th 1015, 1050; see also *People v. Quach* (2004) 116 Cal.App.4th 294, 301 [construing a similar instruction, CALJIC No. 5.56].) Likewise, CALCRIM No. 3472 (no contrived self-defense) "is generally a correct statement of law, which might require modification in the rare case in which a defendant intended to provoke only a non-deadly confrontation and the victim responds with deadly force." (*People v. Eulian* (2016) 247 Cal.App.4th 1324, 1334

25

(*Eulian*); see also *id*. at p. 1333 [citing *People v. Enraca* (2012) 53 Cal.4th 735, 761 (*Enraca*) (concluding that an analogous CALJIC instruction was supported by the evidence in the record)]; *People v. Ramirez* (2015) 233 Cal.App.4th 940, 947 (*Ramirez*).)

Calvert makes no specific argument that this matter is a "rare case" under *Eulian* and *Ramirez*, which might have required the trial court to modify CALCRIM No. 3472. The Court of Appeal in *Ramirez* acknowledged that CALCRIM No. 3472 "states a correct rule of law in appropriate circumstances." (*Ramirez*, *supra*, 233 Cal.App.4th at p. 947.) But the court reversed the defendants' convictions, concluding the instruction misstated the law on the facts of the case because "[t]he instructions and the prosecutor's argument established as a matter of law that defendants were not entitled to imperfect self-defense if they contrived to use *any* force, even nondeadly force, but that was a question for the jury to decide on its own evaluation of the facts." (*Id*. at p. 953.)

Unlike in *Ramirez*, the prosecutor here did not misstate the law of self-defense. Further, Calvert's testimony was inconsistent with the theory he advances on appeal. Calvert contends that the contrived self-defense instruction should have been modified to narrow the type of force that triggers the limitation, but Calvert effectively disclaimed any intent to precipitate a confrontation with the men on the street. Calvert testified that he never shouted " 'Norte' " on the drive to or at the apartment complex and he had no idea he was in gang territory. Calvert said the reason his group traveled to the apartment complex was to obtain marijuana from Ivan Saucedo. Further, when the men on the street ran at Calvert, he told them that he did not " 'bang' " and they " 'got the wrong person.' " He testified that he "really had no choice" about running away from the men because they had surrounded him. Under its own terms, the instruction applies only if the defendant "provokes a fight or quarrel *with the intent to create an excuse to use force*." (See *Eulian*, *supra*, 247 Cal.App.4th at p. 1333, italics added; *Ramirez*, *supra*, 233 Cal.App.4th at pp. 944–946.)

26

Furthermore, we are not convinced by Calvert's argument that the challenged instructions had to explicitly state that "a person loses the right to self-defense *only if his provocative acts are felonious* and only if the responders' use of force is lawful" (italics added). Calvert bases this purported limitation on the provocation doctrine to "felonious" conduct from language in a footnote in a decision by the California Supreme Court that was not about provocation at all. (See *In re Christian S.* (1994) 7 Cal.4th 768, 773, fn. 1 (*Christian S.*).) The issue faced by the California Supreme Court in *Christian S.* was whether the Legislature had abrogated the doctrine of imperfect self-defense through an amendment to the Penal Code. (*Id.* at p. 771.) The Supreme Court concluded that it had not. (*Ibid.*)

In its footnote in *Christian S.*, the Court compared imperfect self-defense with "the ordinary self-defense doctrine" and stated neither may "be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified." (*Christian S.*, *supra*, 7 Cal.4th at p. 773, fn. 1.) We do not agree that this parenthetical statement in a footnote in a decision focused on a different legal question should be read to limit the law of provocation in the manner urged by Calvert.

In a later case, the California Supreme Court explained that "[t]he doctrine of imperfect self-defense cannot be invoked . . . by a defendant whose own wrongful conduct (for example, a physical assault or commission of a felony) created the circumstances in which the adversary's attack is legally justified." (*People v. Booker* (2011) 51 Cal.4th 141, 182; see also *Enraca*, *supra*, 53 Cal.4th at p. 761 [quoting *Christian S.*]; § 197, subds. (1), (3).) Again, we do not agree with Calvert that this parenthetical statement stands for the proposition that the provocation doctrine is limited to those who act feloniously. Calvert reads too much into the passages he cites. It is merely "wrongful conduct" that suffices. The challenged instructions accurately

conveyed that principle. Moreover, CALCRIM No. 3471 addressed the principle that Calvert claims was lacking here. It informed his jury that if Calvert "used only non-deadly force, and the opponent responded with such sudden and deadly force that [Calvert] could not withdraw from the fight, then [Calvert] had the right to defend himself with deadly force and was not required to try to stop fighting."

In sum, because the challenged instructions were legally correct under the present circumstances, we conclude that Calvert's substantial rights were not affected by those instructions.

For similar reasons, we reject Calvert's alternative claim that his defense counsel was constitutionally ineffective for failing to request that CALCRIM Nos. 3471 and 3472 be modified or not be given at all. As noted, both instructions were legally correct statements of the law, both in the abstract and under the facts of this case. Accordingly, we decide that Calvert has failed to carry his burden to show that his counsel's performance was constitutionally deficient.

B. *Evidence about Gang Affiliation*

Calvert contends that the evidence of his post-*Miranda* statements about gang affiliation made to Officer Martin during the jail classification process should have been excluded. Calvert claims that his statements were involuntary because the "questions about gang affiliation inherently put a person in a coercive situation of having to admit any gang affiliation or risk being mixed with enemies." Calvert further asserts that "Martin actively induced Calvert's statements by threatening to house Calvert with Sureños if he did not admit to being a Norteño and by falsely promising that his statements would not be used in court."

Additionally, Calvert contends that Detective Mula's cross-examination testimony about Calvert having said during his police interview that "he was Varrio Via Sol should have been excluded because it was inadmissible testimonial hearsay."

28

Calvert acknowledges that his defense counsel did not object to Officer Martin's or Detective Mula's testimony. Nevertheless, he urges this court to forgo forfeiture because his claims of error are grounded in his constitutional rights (namely, the privilege against self-incrimination, due process, and confrontation). Alternatively, Calvert asserts that his counsel was constitutionally ineffective by failing to object to the evidence Calvert currently challenges. Furthermore, Calvert argues that the erroneous admission of his statements regarding gang affiliation warrant reversal under any applicable standard of prejudice.

The Attorney General responds that Calvert forfeited his claim regarding his statements to Officer Martin, invited any error regarding Detective Mula's testimony because the challenged statement was elicited on cross-examination by Calvert's own counsel, and has failed to demonstrate that his defense counsel performed deficiently or that any deficient performance prejudiced Calvert.

### 1. Additional Background

As discussed *ante* (part I.B.1.), on the day of the crime, Officer Jennings and Sergeant Mendoza read Calvert his *Miranda* rights and interviewed him for about three hours. After the police interview, Calvert was taken to the county jail for booking. There, Officer Martin questioned Calvert regarding his gang affiliation for the purpose of classification. At a section 402 hearing held during trial, the trial court ruled that Calvert knowingly, voluntarily, and intelligently waived his *Miranda* rights as to both the police interview and the subsequent questioning by Martin during the jail classification process.

At trial, Officer Martin testified that during the jail classification process he asked Calvert if he considered himself to be a gang member, to which Calvert replied " 'No.' " Martin then asked Calvert if " 'it would be okay [to] put [him] with the Sureños.' " Calvert immediately responded " 'No.' " Next, Martin "kind of said, 'So you considered yourself a Norteño, then.' " Calvert replied "Yes." Martin followed up on this answer by asking Calvert if he was affiliated with any particular gang subset. Calvert said he was a

29

member of "Via Sol" and that his moniker was " 'Ace.' " Martin also testified that nothing in his interaction with Calvert led him to believe that Calvert was impaired or under the influence of drugs or alcohol during the questioning.

The prosecutor did not present evidence at trial about what if anything Calvert had said during the police interview about his gang affiliation. However, during defense counsel's cross-examination of Detective Mula, Mula mentioned the police interview. In particular, defense counsel questioned Mula about the bases of his opinion that Calvert was a gang member and the testimony that Officer Martin had provided about what Calvert said about his gang affiliation. The cross-examination of Mula included the following exchange: "Q. All right. And so the correctional officer [Martin] said to him, 'So you're a Norteño.' [¶] And that's when Calvert said, 'Yeah.'

"A. I -- I don't . . . think he said, 'So you're a Norteño,' yes. But I -- I don't remember the exact testimony for that.

"Q. Okay. But that admission and the way it went down was an important factor for you in going from skeptical to convinced.

"A. That was one of the things that I did consider, is when I called him -- I mean, when you go to these interview and interrogation schools, you're taught to ask questions in a certain way so they don't elicit a certain response. [¶] So I asked Mr. Martin -- I did my own investigation on it -- about the circumstances of how he asked for it. And I asked him, specifically, 'Did Calvert feel like . . . he had to choose the Norteños for his own protection based off the crime that he was admitted in?' [¶] And he said, 'No.' [¶] *And I noticed during that admission that he said -- he identified himself as Via Sol, which is a specific gang to Sunnyvale, which is the same that matched Mr. -- Detective Jennings' statement that he provided earlier in the night.*

"Q. Detective Martin told you nothing – or Correctional Officer Martin told you nothing different than what he testified to, under oath, up on that witness stand; true?

"A. He did tell me something different. [¶] When you're talking about in the context of when I asked him, specifically, 'Is he saying this for his own protection?' he said, 'No.'

"Q. So Correctional Officer Martin told you something different than what he told this jury under oath.

"A. I'm talking about a direct answer that I asked him that was not asked in this courtroom." (Italics added & omitted.)

As detailed *ante* (part I.B.2.), Calvert addressed the issue of gang affiliation in his own testimony. He denied ever being a member of the VVS gang or any other Norteño gang. He also testified extensively about the interaction he had with Officer Martin during his booking into the county jail. Calvert recounted the conversation he had had with Martin in detail and provided explanations for his various statements. Calvert's testimony included that Martin had said gang affiliation "wasn't even going to be brought up in court" and would not be used against Calvert in court. Calvert also testified that, in response to Martin's statements about where he (Calvert) would be housed in the jail and that he would have to claim to be a Northerner to the other inmates there, Calvert told Martin he "was a Northerner" but never said he was member of or associated with the VVS gang.

## 2. Legal Principles

"[S]tatements made by a defendant subject to custodial interrogation are inadmissible (for certain purposes) unless the defendant was 'warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.' [Citations.] 'The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently.' " (*People v. Krebs* (2019) 8 Cal.5th 265, 299 (*Krebs*); see also *People v. Elizalde* (2015) 61 Cal.4th 523, 530–540 [holding

31

that jail classification interviews may constitute custodial interrogation for purposes of *Miranda*].)

"Independent of whether a defendant's rights under *Miranda* were observed, his or her statements may not be admitted unless they were voluntary. 'The court in making a voluntariness determination "examines 'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession." ' [Citation.] The prosecution bears the burden of proof and must show 'by a preponderance of the evidence the statements were, in fact, voluntary.' " (*Krebs*, *supra*, 8 Cal.5th at p. 299.)

"Whether the confession was voluntary depends upon the totality of the circumstances." (*People v. Carrington* (2009) 47 Cal.4th 145, 169.) "In evaluating the voluntariness of a statement, no single factor is dispositive. [Citation.] The question is whether the statement is the product of an ' "essentially free and unconstrained choice" ' or whether the defendant's ' "will has been overborne and his capacity for self-determination critically impaired" ' by coercion. [Citation.] Relevant considerations are ' "the crucial element of police coercion [citation]; the length of the interrogation [citation]; its location [citation]; its continuity" as well as "the defendant's maturity [citation]; education [citation]; physical condition [citation]; and mental health." ' [Citation.] [¶] 'In assessing allegedly coercive police tactics, "[t]he courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable." [Citation.]' [Citation.] [¶] A confession is not involuntary unless the coercive police conduct and the defendant's statement are causally related." (*People v. Williams* (2010) 49 Cal.4th 405, 436–437 (*Williams*).)

Regarding the failure to object to evidence of allegedly involuntary statements, "[a] defendant ordinarily forfeits elements of a voluntariness claim that were not raised below." (*Williams*, *supra*, 49 Cal.4th at p. 435; see also *People v. Kennedy* (2005) 36 Cal.4th 595, 611–612 (*Kennedy*) [forfeiture of a coercion claim], disapproved of on

32

another ground in *Williams*, *supra*, 49 Cal.4th at p. 459.) Likewise, the California Supreme Court has applied the forfeiture rule "numerous times to find forfeiture of a constitutional right of confrontation claim." (*People v. Arredondo* (2019) 8 Cal.5th 694, 710.)

Regarding a defendant's IAC claim, "[t]he decision whether to object to the admission of evidence is 'inherently tactical,' and a failure to object will rarely reflect deficient performance by counsel." (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1335, abrogated on another ground as stated in *People v. Hardy* (2018) 5 Cal.5th 56, 100; see also *People v. Kelly* (1992) 1 Cal.4th 495, 520.) There is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." (*Strickland*, *supra*, 466 U.S. at p. 689.) "If the record on appeal ' " 'sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation,' the claim on appeal must be rejected." ' " (*People v. Vines* (2011) 51 Cal.4th 830, 876, overruled on other grounds by *Hardy*, at pp. 103–104; see also *Hoyt*, *supra*, 8 Cal.5th at pp. 958–960.)

### 3. Analysis

Beginning with the issues of forfeiture and invited error, we agree with the Attorney General that Calvert's claim asserting the involuntariness of his statements to Officer Martin is forfeited by Calvert's failure to raise the issue at trial. (See *Williams*, *supra*, 49 Cal.4th at p. 435; *Kennedy*, *supra*, 36 Cal.4th at pp. 611–612.) We further conclude that Calvert's claim challenging Detective Mula's cross-examination testimony is forfeited by the failure to object and move to strike that testimony. (See *People v. Parker* (2017) 2 Cal.5th 1184, 1229–1230; Evid. Code, § 353, subd. (a); see also *United States v. Miller* (9th Cir. 1985) 771 F.2d 1219, 1234.)

Turning to Calvert's alternate contention that his defense counsel provided ineffective assistance by failing to object to the challenged evidence on the grounds

raised in this appeal, we conclude Calvert has not demonstrated deficient performance by his defense counsel.

Regarding the alleged involuntary statements told to Officer Martin, Calvert fails to show that there could be no satisfactory explanation for his defense counsel's failure to object on voluntariness grounds. " 'Coercive police activity is a necessary predicate' " of involuntariness and must be " 'the "proximate cause" of the statement in question." ' " (*People v. Jablonski* (2006) 37 Cal.4th 774, 814.) Here, there is no support in Officer Martin's testimony for the assertion that Martin coerced Calvert to say that he was a gang member. The fact that Martin asked Calvert if thought he could be housed with Sureños does not amount to a threat to in fact house him with Sureños. Nor is it conduct that would tend to produce an involuntary and unreliable statement about gang affiliation. Martin's inquiry regarding the propriety of housing Calvert with Sureños is distinct from whether Calvert considered himself to be a Norteño affiliated with the VVS gang. It does not follow that a person who had reason to protest being housed with Sureños due to the circumstances of his offense would consequently admit to being affiliated with the Norteños.

Detective Mula's testimony about his own follow-up conversation with Officer Martin concerning Martin's questioning of Calvert corroborated the lack of coercion in that questioning. Given this evidence, Calvert's defense counsel could have reasonably concluded that the prosecution would have been able to prove the voluntariness of Calvert's statements to Officer Martin regarding gang affiliation had counsel objected on that ground.

In addition, that Calvert testified in the defense case about his interaction with Officer Martin does not foreclose the possibility of a satisfactory explanation for defense counsel's failure to raise the voluntariness issue at trial. In his testimony, Calvert stated that Martin had promised that gang affiliation would not be raised in court and urged Calvert to say, upon being housed in the jail, that he is a "Northerner." Nevertheless, the

34

record before us does not indicate whether Calvert ever recounted this or any other version of the booking interview to his counsel before taking the witness stand. Moreover, Calvert does not point to anything in the record demonstrating that his counsel viewed his testimony about his interaction with Martin as sufficiently credible to assert a viable voluntariness claim in the face of Martin's testimony. Relatedly, Calvert does not direct us to any point in his counsel's closing argument where counsel expressly urged the jurors to accept Calvert's version of the interaction with Martin—even though the prosecutor had already challenged Calvert's story in his closing argument. Calvert has not persuaded us that defense counsel's decisions were so unreasonable as to fall outside the bounds of constitutionally sufficient representation. Defense counsel could reasonably have sought to avoid calling attention to Calvert's statements on this point, having made a tactical decision about how best to support Calvert's credibility before the jury and the court.

In sum, based on the record before us, we cannot conclude that defense counsel performed deficiently by failing to raise the alleged involuntariness issue. Calvert's IAC claim is "more appropriately resolved in a habeas corpus proceeding." (*Mai*, *supra*, 57 Cal.4th at p. 1009.)

Similarly, Calvert has not shown that there could be no satisfactory explanation for his defense counsel's failure to object to the following testimony by Detective Mula: "And I noticed during that admission [to Officer Martin] that he said – [Calvert] identified himself as Via Sol, which is a specific gang to Sunnyvale, *which is the same that matched Mr. -- Detective Jennings' statement that he provided earlier in the night*." (Italics added & omitted.)

Calvert's IAC claim turns on his particular interpretation of the above-quoted sentence. Specifically, Calvert asserts that the sentence means Detective Mula testified "that his opinion [about Calvert's gang affiliation] was supported by the fact that Calvert had identified himself to Officer Jennings during the interrogation as being 'Via Sol.' "

Based on this interpretation of Mula's testimony, Calvert argues that the testimony amounted to "inadmissible testimonial hearsay" and "it is inconceivable that counsel would decide not to object to . . . inadmissible incriminating statements."

As a threshold matter, we reject Calvert's assertion that Detective Mula's testimony conveyed that Calvert had identified himself to Officer Jennings during the police interview as a member of the VVS gang. The challenged portion of Mula's testimony is not as clear as Calvert makes out. Even if we assume that the "he" in the phrase "Detective Jennings' statement that *he* provided earlier in the night" (italics added) refers to Calvert, the rest of the sentence does not clearly state that Calvert, in fact, identified himself to both Officer Martin *and* Officer Jennings as a VVS member. On its face, the challenged sentence does not state what exactly Calvert had "provided earlier in the night" "that matched" his self-identification "as Via Sol, which is a specific gang to Sunnyvale." The sentence could be read to mean that Calvert had provided to Jennings some information about the VVS gang itself, not that he was a member of that gang. Moreover, and notably, Calvert does not point to any assertion by the prosecutor in closing argument that the challenged portion of Mula's testimony supported the prosecution's contention that Calvert was a gang member.

Given the ambiguity in the challenged portion of Detective Mula's cross-examination testimony, a reasonably competent defense counsel could have rationally decided that the testimony was not incriminating and thus not worthy of an objection and motion to strike. Hence, we cannot conclude that there is no satisfactory explanation for counsel's inaction in the face of Mula's ambiguous statement. (See *Mai*, *supra*, 57 Cal.4th at p. 1009.)

Furthermore, even assuming arguendo that defense counsel's performance was deficient for failing to object to the identified portion of Detective Mula's testimony, Calvert fails to show any prejudice resulting from the admission of that testimony. The prosecutor presented an array of other evidence to support Mula's opinion that Calvert

36

was a member of the VVS gang. And, as noted, the prosecutor did not mention the challenged testimony when arguing his case to the jury. Under these circumstances, we conclude that even if the trial court would have struck Mula's fleeting ambiguous statement had counsel objected to it, there is no reasonable probability that the result of Calvert's trial would have been different.

C. *Cumulative Error*

Having concluded *ante* that Calvert's two claims challenging his convictions are without merit, we in turn reject his claim of cumulative prejudice resulting from the asserted errors. There is no prejudicial error to cumulate. (See *People v. Hensley* (2014) 59 Cal.4th 788, 818.)

D. *Gang Enhancement Allegations*

Calvert contends that recent amendments to the gang enhancement statute (§ 186.22) made by Assembly Bill 333 (Stats. 2021, ch. 699, §§ 3, 4) require reversal of the jury's true findings on the gang enhancement allegations (§ 186.22, subd. (b)(5)) attached to each of the four counts of conviction. Calvert asserts that the legislative revisions to section 186.22 increased the prosecution's burden to prove certain elements of the gang enhancements and those revisions apply to his non-final judgment. He urges us to vacate the jury's findings because "the jury was not required to make findings as to the additional elements required by [Assembly Bill] 333 and the state cannot show beyond a reasonable doubt that a jury would find the enhancements true under the current law." Finally, he asserts that we should remand the case to allow the prosecutor an opportunity to retry the gang enhancement allegations under the current law.

The Attorney General agrees that Calvert is entitled to the retroactive benefit of Assembly Bill 333's amendments to section 186.22. We concur. (See *People v. Tran* (2022) 13 Cal.5th 1169, 1206–1207 (*Tran*).) The Attorney General further agrees with Calvert that a remand is necessary, conceding that the evidence presented at trial "failed

to show that VVS gang members collectively engaged in a pattern of criminal gang activity" as defined by current section 186.22.

Considering the parties' agreement on the deficiencies in the proof under current section 186.22, and based on our review of the record, we conclude that reversal of the jury's findings on the gang enhancement allegations is required. (See *Tran*, *supra*, 13 Cal.5th at p. 1207.)

Accordingly, we vacate the jury's findings on the four gang enhancement allegations attached to counts 1 through 4. On remand, the district attorney shall be afforded the opportunity to retry Calvert on the gang enhancement allegations based on the current version of section 186.22. (See *People v. E.H.* (2022) 75 Cal.App.5th 467, 480; *People v. Sek* (2022) 74 Cal.App.5th 657, 669–670.)

E. *Sentencing Claims*

Calvert raises several claims related to his sentencing. In one his claims, Calvert contends that recent legislative changes made to section 1170 apply retroactively to his non-final judgment and that, under current section 1170, subdivision (b), this matter should be remanded for the trial court to consider reducing the sentence imposed on count 2 from the middle term to the lower term.

Current section 1170, subdivision (b)(6), provides in relevant part: "Notwithstanding paragraph (1), and unless the court finds that the aggravating circumstances outweigh the mitigating circumstances that imposition of the lower term would be contrary to the interests of justice, the court shall order imposition of the lower term if any of the following was a contributing factor in the commission of the offense: [¶] . . . [¶] (B) The person is a youth, or was a youth as defined under subdivision (b) of Section 1016.7 at the time of the commission of the offense." (Stats. 2021, ch. 695, §§ 5.3, 6 [Assembly Bill No. 124; eff. Jan. 1, 2022]; Stats. 2021, ch. 731, §§ 1.3, 3(c)

[Senate Bill No. 567; eff. Jan. 1, 2022].)[14]  In turn, section 1016.7, subdivision (b), states: "A 'youth' for purposes of this section includes any person under 26 years of age on the date the offense was committed."  (Stats. 2021, ch. 695, § 4.)

The Attorney General concedes that the recent legislative change to section 1170, subdivision (b)(6), applies retroactively to this case.  We agree.  (See *People v. Flores* (2022) 73 Cal.App.5th 1032, 1038–1039 (*Flores*); *People v. Garcia* (2022) 76 Cal.App.5th 887, 902; *People v. Banner* (2022) 77 Cal.App.5th 226, 240 (*Banner*).)

The record in this case demonstrates that Calvert was 21 years old at the time of the June 9, 2018 offense.  Further, at Calvert's sentencing hearing, the trial court explained its imposition of the middle term of seven years on count 2 by stating that it "does not find the factors in aggravation or mitigation to preponderate."

The Attorney General agrees with Calvert that this case should be remanded for resentencing.  The Attorney General concedes that "it is possible that [Calvert's] age 'was a contributing factor in the commission of the offense' that would presume imposition of the lower term."  The Attorney General's concession is well taken.

Because Calvert was sentenced before section 1170, subdivision (b)(6)(B), became effective, the trial court here necessarily imposed the middle term on count 2 without considering the statutory presumption now potentially available to Calvert under the revised statute.  We thus will vacate Calvert's sentence entirely and remand for the trial court to hold a new sentencing hearing and resentence Calvert on all counts.  (See *People v. Gerson* (2022) 80 Cal.App.5th 1067, 1096; *Banner*, *supra*, 77 Cal.App.5th at p. 242; *Flores*, *supra*, 73 Cal.App.5th at p. 1039.)  We express no opinion as to how the trial court should exercise its discretion on remand.

---

[14] We note that the Legislature recently amended section 1170 again, but the new amendments (effective January 1, 2023) do not change the provisions relevant to our analysis of Calvert's claim.  (See Stats. 2022, Ch. 744, § 1 [Assembly Bill No. 960].)

Considering our conclusion that Calvert should be resentenced in full, we do not address Calvert's other claimed sentencing errors. The trial court can address them at resentencing, as necessary. Calvert will have the opportunity at resentencing to present evidence and argument concerning his ability to pay any fines, fees, and assessments. Additionally, Calvert may raise any issue regarding the $129.75 CJAF under Assembly Bill 1869 or the administrative fees for the victim restitution orders under Assembly Bill 177 during resentencing.

## III. DISPOSITION

The judgment is reversed. The true findings on the gang enhancement allegations (Pen. Code, § 186.22, subd. (b)(5)) attached to counts 1–4 are reversed. Calvert's convictions and the remaining enhancements are affirmed. The sentence is vacated in its entirety. The matter is remanded to the trial court for a possible retrial of the gang enhancement allegations. If the district attorney elects not to retry Calvert on the gang enhancement allegations, or at the conclusion of any retrial, the trial court is directed to resentence Calvert in a manner consistent with this opinion under current sentencing law (see Pen. Code, § 1170).

_____
                  Danner, J.

WE CONCUR:

_____
Bamattre-Manoukian, Acting P.J.

_____
Wilson, J.

**H047146**
*People v. Calvert*